SAMUEL, Judge.
Plaintiff-appellant, Petero Cavallo, instituted suit against the New Orleans Public Belt Railroad Commission under LSA-Civil Code, Article 2315 for damages for the death of Mabel Fitch, whom the plaintiff claims was his wife by reason of an alleged common-law marriage in Texas. The defendant admitted the death but denied the marriage and the plaintiff’s right to bring suit thereunder, denied any negligence on the part of the railroad, and alternatively pleaded contributory negligence on the part of both the plaintiff and the de *420 cedent. Judgment was rendered in favor of the defendant dismissing the plaintiff’s suit. From this judgment the plaintiff has appealed, resting his case here on the doctrine of last clear chance or discovered peril.
Our conclusion on the question of liability, based solely on the facts involved in the death, is such that a determination of the validity of the common-law marriage and its recognition or non-recognition by the Courts of Louisiana has become unnecessary and, accordingly, those questions are pretermitted.
The death occurred in the City of New Orleans on August 21, 1957, at about 1:15 a. m. On that date and shortly before that time the decedent, who suffered from a severe mental illness, attempted to kill herself with a knife. She was prevented from doing so by her brother and the plaintiff but managed to escape from them and fled into the streets. She was bareheaded, with her hair in some disarray, barefooted and wore only a skirt and blouse, with the blouse out from the skirt.
The train involved, owned and operated by the defendant.and consisting of a diesel engine pulling a “cut” of thirty freight cars with the front of the engine facing the first car, was on its main-line track near the Erato Street wharf and moving in the direction of Thalia Street, less than one block away. It had just stopped to allow another train to clear and was to stop again at Thalia Street in order to throw the switch preparatory to leaving the main-line. The train was traveling very slowly at a speed of approximately two or three miles per hour. The engineer was on that side of the engine cab opposite from the controls, which were being operated by the fireman. The area, occupied only by train tracks, warehouses and industrial stores was one in which women pedestrians were practically unknown and was fairly well lighted.
The movements of the decedent could be seen only from that side of the train occupied by the engineer whose testimony is the only evidence in the record as to her actions. He first saw the decedent when she was about seventy-five feet away from him and did not see her at any closer distance until after her death. She came around a shed, turned into a roadway, and walked a short distance in the direction opposite from and parallel with that in which the train was traveling. Then she turned and walked in the direction of the train, which was about twenty feet away from her, crossed the two rails of an intervening track to a position close to the moving train, stooped to her hands and knees, and crawled between the rear wheel of the second box car and the first wheel of the third box car. The latter, which was resting on her body when the train came to a stop, killed her.
The engineer testified that upon seeing the woman he did not notice anything wrong with her dress or appearance and that he expected her simply to wait until the train had passed but that she never stopped walking and he yelled “hold it” (which apparently from the record is common railroad terminology used to bring the train to an emergency stop) to the fireman when he saw her stoop down. The emergency brakes were immediately put on and the train brought to a stop within a distance of a few feet. The engineer estimated the time between when he first saw the woman to the time when she was run over to be about one and one-half minutes.
Both sides assumed that the decedent intended to commit suicide and the opinion of the one medical expert who testified in the case, a psychiatrist, lends some support, and certainly does not contradict, this assumption. The psychiatrist also testified that the woman was sufficiently sane to know the danger involved and to know that she would die if she got under the wheels of the train.
It is the contention of the plaintiff that because of the decedent’s apparel and general appearance, and the fact that it was so unusual for a woman to be in the area at that time of the morning, the engineer should *421 have realized her mental condition and the danger connected therewith and owed a duty to the decedent beyond that of bringing the train to a stop at the time that he did. We cannot agree.
In the absence of extraordinary circumstances which clearly indicate otherwise, a train crew may assume that an adult approaching a railroad track is in possession of all his ordinary faculties, will retain his position of safety, and will not recklessly expose himself to danger. Nolan v. Illinois Central R. Co., 1919, 145 La. 483, 82 So. 590; Wells v. Morgan’s Louisiana & T. R. & S. S. Co., 1920, 147 La. 58, 84 So. 493; Patterson v. Yazoo & M. V. R. Co., La.App.1939, 187 So. 305.
Such extraordinary circumstances are not present here. Considering all the facts involved, it is our opinion that the engineer did all that the law requires him to do, and indeed all that he could do, by causing the train to be brought to an immediate stop as soon as he could be reasonably expected to realize that the decedent was not going to remain in her position of safety. Whether the decedent committed suicide or simply crawled beween the rolling wheels of the train for the purpose of crossing the tracks is of no importance. The engineer could not have foreseen either action until he saw her stoop to a crawling position. We find no negligence on the part of the defendant.
The plaintiff cannot recover under the doctrine of last clear chance or discovered peril. For in the absence of fault on the part of the defendant (and we have found such an absence) there can be no recovery under LSA-Civil Code, Article 2315.
The judgment appealed from is affirmed at the cost of the appellant.
Affirmed.